Michael S. Kogan (SBN 128500)
**KOGAN LAW FIRM, APC**
11500 W. Olympic Blvd., Suite 400
Los Angeles, California 90064
Telephone (310) 954-1690
mkogan@koganlawfirm.com

Attorneys for Debtor

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| **In re** | **Case No. 2:25-bk-10067-NB** |
| | **Chapter 11** |
| **ALPINE CORPORATION,** | |
| | **MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT – ISRAEL DISCOUNT BANK OF NEW YORK; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF ROBBY SOOFER IN SUPPORT THEREOF** |
| | **Date:** September 29, 2026<br>**Time:** 1:00 p.m.<br>**Place:** Courtroom 1545<br>**255 E. Temple St.**<br>**Los Angeles, CA 90012**<br>**(or Via Zoomgov per posted procedures)** |

Through the Motion For Approval of Settlement Agreement – Israel Discount Bank of New York (the "**Motion**"), Alpine Corporation (the "**Debtor**" or "**Alpine**"), Aspen Peak Corporation ("**Aspen Peak**"), Garden Plus Sales ("**Garden Plus**") (the Debtor, Aspen Peak and Garden Plus will collectively be referred to herein as the "**Related Parties**"), Robby Soofer, ("**R. Soofer**"), Caroline Neman Soofer, ("**C. Soofer**"), and Robby Soofer and Caroline Neman Soofer, as Trustees of the Soofer Family Trust ("**Soofer Trust**," together with R. Soofer and C. Soofer, individually and collectively, the "**Guarantor**"), on the one hand, and Israel Discount Bank of New York ("**IDB**" or "**Lender**" or "**Bank**") (with Debtor, Related Parties, Guarantor and IDB being referred to herein, collectively, as the "**Parties**"), in which the Debtor, the Related Parties and Guarantor and IDB have resolved the many claims by and between them. The terms of the compromise are embodied in the Settlement Agreement (the "**Agreement**"), attached as Exhibit "A" to the Motion and incorporated herein by this reference.[1]

The Debtor believes that the settlement embodied in the Agreement is in the best interests of all parties and should be approved by the Court. Consequently, the Court should defer to the business judgment of the Debtor and approve the proposed settlement. Therefore, the Motion should be approved.

The settlement avoids the risks and costs associated with litigation, and provide certainty. As explained further below, the Agreement essentially provide for resolution of the issues contained in the many disputed by and between the Parties. Therefore, as set forth in detail below, the Court should grant the Motion and approve the Agreement because it is reasonable, fair, and in the best interests of the estate.

**CONSULT THE ATTACHED AGREEMENT FOR THE FULL TERMS AND CONDITIONS OF THE AGREEMENT**

There is good and sufficient cause for granting this Motion. Simply put, the Agreement is in the best interests of the estate and its creditors because it will resolve claims against the Debtor,

---

[1] The Motion includes the Settlement Agreement and the Forbearance Agreement, Consent and Release. The additional exhibits will be provided to the Court prior to the hearing on the Motion.

including the release of claims, payment of claims, while avoiding the risks and costs associated with litigation.

In this case, the Debtor began pursuing and examining information regarding the potential claims by and against IDB before the bankruptcy case was filed and throughout the bankruptcy case. After a thorough examination and analysis of the value of the claims by and against IDB, engaging in extensive litigation and contested matters in this bankruptcy case, both the Debtor and IDB employing financial consultants to thoroughly analyze each of the respective parties claims and the Debtors ability to operate and continue operating into the future, participating in extensive negotiations, correspondence, reviewing and analyzing documents supplied by each Party, and ultimately many iterations of the settlement agreement which involved non-debtor parties as well, the Debtor elected to enter into the proposed settlement based upon (1) the amount of time to resolve the litigation and the costs to defend and continue with the litigation and contested matters, (2) the potential risks of the litigation and contested matters concerning the estate's property interest, and the net benefit available to the estate, (3) the collectability of the settlement, and (4) the settlement would put the Debtor in a better position for a distribution on allowed claims and provide funds to utilize in its reorganization efforts, and reduce its obligations to IDB dramatically.

The Motion is based upon the concurrently filed Notice, this Motion, the attached Memorandum of Points and Authorities, the Declaration of Robby Soofer, the pleadings on file in this case, and upon such other evidence as may properly be presented to the Court at the hearing.

DATED: September 3, 2026

**KOGAN LAW FIRM, APC**
MICHAEL S. KOGAN

By: /s/Michael S. Kogan
Michael S. Kogan
Attorneys for Debtor

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Through the Motion For Approval of Settlement Agreement – Israel Discount Bank of New York (the "**Motion**"), Alpine Corporation (the "**Debtor**" or "**Alpine**"), Aspen Peak Corporation ("**Aspen Peak**"), Garden Plus Sales ("**Garden Plus**") (the Debtor, Aspen Peak and Garden Plus will collectively be referred to herein as the "**Related Parties**"), Robby Soofer, ("**R. Soofer**"), Caroline Neman Soofer, ("**C. Soofer**"), and Robby Soofer and Caroline Neman Soofer, as Trustees of the Soofer Family Trust ("**Soofer Trust**," together with R. Soofer and C. Soofer, individually and collectively, the "**Guarantor**"), on the one hand, and Israel Discount Bank of New York ("**IDB**" or "**Lender**" or "**Bank**") (with Debtor, Related Parties, Guarantor and IDB being referred to herein, collectively, as the "**Parties**"), in which the Debtor, the Related Parties and Guarantor and IDB have resolved the many claims by and between them. The terms of the compromise are discussed below, and are embodied in the Settlement Agreement (the "**Agreement**"), attached as Exhibit "A" to the Motion and incorporated herein by this reference.[2]

The Debtor believes that the settlement embodied in the Agreement is in the best interests of all parties and should be approved by the Court. Consequently, the Court should defer to the business judgment of the Debtor and approve the proposed settlement. Therefore, the Motion should be approved.

The settlement avoids the risks and costs associated with litigation, and provide certainty. As explained further below, the Agreement essentially provide for resolution of the issues contained in the many disputed by and between the Parties. Therefore, as set forth in detail below, the Court should grant the Motion and approve the Agreement because it is reasonable, fair, and in the best interests of the estate.

---

[2] The Motion includes the Settlement Agreement and the Forbearance Agreement, Consent and Release. The additional exhibits will be provided to the Court prior to the hearing on the Motion.

# I.

# FACTUAL BACKGROUND

## A. Background Facts.

Alpine Corporation (the "**Debtor**"), the debtor and debtor in possession herein in this bankruptcy case, commenced its Chapter 11 bankruptcy case by filing a Voluntary Petition under Chapter 11 of 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**") on January 5, 2026. The Debtor is operating its business and managing its financial affairs as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor was established in 1999 and is a California-based outdoor décor and holiday décor company. It began as a regional wholesale distributor serving local garden centers, and over time expanded into a national importer and distributor serving major brick-and-mortar retailers, online platforms, and direct-import customers across the United States. The Debtor designs and supplies fountains, farm décor, and outdoor holiday décor, combining classic styles with contemporary aesthetics. At its peak, the Debtor employed approximately 80 full-time equivalent employees across its domestic and international operations.

The Debtor sources its products primarily from Asia and has historically fulfilled customer orders through multiple distribution facilities. Supported by an integrated IT system for inventory tracking and order management, the Debtor maintained a broad supplier network. As of the Petition Date, the Debtor operates from leased facilities in City of Industry, Simi Valley, and City of City of Industry, California.

During the COVID-19 pandemic, the Debtor experienced a period of substantial growth driven by unprecedented consumer trends, including increased home improvement spending, nesting behavior, shifts toward outdoor living, and federal stimulus support to consumers. Demand for home and outdoor décor products increased sharply, retailers significantly expanded purchase commitments, and consumers redirected discretionary income toward durable goods. During this period, the Debtor's annual revenues reached approximately $72,000,000.

To support nationwide demand and retailer programs, the Debtor entered into an expanded credit facility of $20,000,000 with IDB Bank, and invested in inventory, warehousing capacity, and staffing. These investments were consistent with prevailing industry forecasts and retailer purchase commitments at the time. However, this expansion coincided with dramatic increases in supply chain costs, including freight increases from approximately $3,000 to $25,000 per

container, widespread port congestion, demurrage and detention, and delays that required the Debtor to obtain additional warehouse space, racking, equipment, and staffing. Overhead increased substantially and remained elevated even as demand later decreased.

As pandemic conditions normalized, consumer behavior shifted rapidly toward services and away from goods, resulting in industry-wide declines in discretionary spending. Retailers significantly reduced purchasing, shortened ordering cycles, and became overstocked. For example, Amazon shortened its purchase windows from roughly nine months to about sixty days, and other online marketplaces increased fees, chargebacks, compliance costs, and return penalties, further compressing margins and constraining liquidity.

At the same time, macroeconomic conditions imposed additional pressure. Inflationary increases in materials, labor, fuel, and freight elevated operating costs, while rising interest rates reduced consumer discretionary spending and increased the Debtor's cost of capital. Tariff changes also increased landed costs on imported products, creating additional financial strain in categories core to the Debtor's business. Although industry demand remained stable relative to pre-pandemic levels, it declined significantly relative to pandemic-era highs, and retailers did not return to pre-2020 purchasing patterns. By late 2025, revenues of the Debtor declined to approximately $30.000,000 annually.

These conditions created significant liquidity strain. The Debtor maintained a cost structure and debt load sized for a $72,000,000 business, while operating at substantially lower revenue levels. High warehouse occupancy costs, logistics expenses, and variable fulfillment costs, combined with increased borrowing base pressure from its IDB, aging China accounts payable, and a lack of available new capital, resulted in persistent operating losses. Notwithstanding substantial cost reductions, the Debtor was unable to generate sufficient cash flow to service obligations or maintain vendor relationships.

To preserve operations and maximize value for stakeholders, the Debtor's equity holder, Robby Soofer, contributed significant funds to the Debtor in the form of unsecured loans. These funds were used to support payroll, pay suppliers, fund operating shortfalls, and sustain business continuity during a period of acute financial distress.

By late 2025, the combination of post-pandemic demand contraction, supply chain disruption, macroeconomic pressures, reduced retailer commitments, and increased operating costs rendered the Debtor unable to continue operating under its existing cost structure and debt obligations. Moreover, in the weeks before the bankruptcy filing, certain of the Debtors creditors

contacted many of the Debtors customers and attempted to collect on their alleged claims directly from the Debtors customers. The Debtor believes that, absent relief under Chapter 11, continued operations would be at risk, and recoveries to stakeholders would be materially impaired.

B. **Relationship of the Debtor and other parties with IDB.**

IDB extended credit facilities to Debtor and the Related Parties in 2021. Thereafter, in 2023, Debtor, the Related Parties and IDB entered into that certain Amended and Restated Loan Agreement dated as of April 21, 2023 and effective as of April 14, 2023 (and together with all amendments to and modifications thereof, the "Loan Agreement"). In connection with the Loan Agreement, IDB extended (i) a term loan in the aggregate principal amount of $1,436,390.12 to Debtor (the "Term Loan") and the Related Parties, and (ii) a revolving line of credit in the aggregate principal amount of up to $16,000,000.00 to Debtor and the Related Parties (the "Revolving Line of Credit," and together with the Term Loan, individually and collectively, the "Loan").

As part of the Revolving Line of Credit, Debtor and the Related Parties executed to and in favor of IDB that certain Revolving Demand Promissory Note dated as of October 15, 2021 in the original maximum principal face amount of $20,000,000.00 (and together with all amendments to and modifications thereof, the "LOC Note"), which was subsequently reduced to $16,000,000.00.

As part of the Term Loan, Debtor and the Related Parties executed to and in favor of IDB that certain Amended and Restated Term Loan Promissory Note dated as of April 21, 2023 in the maximum principal face amount of $1,436,390.12 (and together with all amendments to and modifications thereof, the "Term Note").

In connection with the Loan, Debtor and the Related Parties also executed and delivered to and in favor of IDB, the following additional documents, among others:

Security Agreement dated October 15, 2021 ("Security Agreement"), executed by Debtor and the Related Parties, in favor of IDB. The security interests granted by the Security Agreement are perfected with a first position lien pursuant to (a) as to Alpine, the UCC Financing Statement filed with the California Secretary of State on October 18, 2021, as File No. U210094255932, (b) as to Aspen Peak, the UCC Financing Statement filed with the California Secretary of State on

October 18, 2021, as File No. U210094258433, and (c) as to Garden Plus, the UCC Financing Statement filed with the California Secretary of State on October 18, 2021, as File No. U210094260124 (the "Financing Statements").

Payment and performance of Debtor's and the Related Parties indebtedness and obligations in connection with the Loan, was and is guaranteed by Guarantor, who each delivered to and in favor of IDB, a Guaranty Agreement dated as of October 15, 2021 (individually and collectively, "Guaranty"). (Debtor, the Related Parties and Guarantor shall be referred to herein, individually and collectively, as "Obligors".)

Debtor, the Related Parties and IDB entered into a First Amendment to Amended & Restated Loan Agreement dated August 28, 2024 (and as acknowledged and agreed to by Guarantor, the "First Amendment"), Second Amendment and Limited Waiver to Amended & Restated Loan Agreement dated April 28, 2025 (and as acknowledged and agreed to by Guarantor, the "Second Amendment"), Third Amendment and Limited Waiver to Amended & Restated Loan Agreement dated May 30, 2025 (and as acknowledged and agreed to by Guarantor, the "Third Amendment"), and Fourth Amendment and Limited Waiver to Amended & Restated Loan Agreement dated August 19, 2025 (and as acknowledged and agreed to by Guarantor, the "Fourth Amendment"), where, among other things, the Revolving Maturity Date was ultimately extended to October 15, 2025.

Pursuant to the Security Agreement, Debtor granted to and in favor of IDB, a first priority security interest in and lien upon all personal property assets of Debtor as described in the Security Agreement (the "Security Agreement Collateral"), to secure, without limitation, payment and performance of the indebtedness and obligations under and in connection with the Loan, including the LOC Note and the Term Note. IDB's security interest in the Security Agreement Collateral was and is perfected under applicable law.

The Loan Agreement, the LOC Note, the Term Note, the Security Agreement, the Financing Statements, the Guaranty, the First Amendment, the Second Amendment, the Third Amendment, the Fourth Amendment and all other assignments, agreements, instruments and other documents executed by Debtor and the Related Parties or Guarantor in connection with the Loan

shall at times hereinafter be referred to collectively as the "Loan Documents". Debtor defaulted under the Loan Documents ("Existing Defaults").

As a result of the Existing Defaults, IDB, at its option, could have commenced enforcement of its rights and remedies under the Loan Documents and applicable law. However, on January 5, 2026 ("Petition Date"), Alpine filed a chapter 11 bankruptcy petition in the United States Bankruptcy Court ("Bankruptcy Court"), Case Number 2:26-BK-10067-NB (the "Case").

On July 21, 2026, IDB filed Poof of Claim No. 59 for the Alpine IMA Guaranty ("IMA Guaranty POC") (defined in Recital R. below), Proof of Claim No. 60 for the LOC Note ("LOC POC"), and Proof of Claim No. 61 for the Term Note ("Term POC") (collectively IMA Guaranty POC, LOC POC and Term POC, "Proofs of Claim").

IDB has been granted replacement liens in the Case ("Replacement Lien Collateral," and together with the Security Agreement Collateral, the "Collateral").

On or about February 2, 2026, IDB commenced an action in the Los Angeles Superior Court entitled Israel Discount Bank of New York, a New York banking corporation v. Aspen Plus Sales, a California corporation; Garden Plus Sales, a California corporation; Caroline Neman Soofer, an individual; Robby Soofer and Caroline Neman Soofer, as Trustees of the Soofer Family Trust, etc., et al., for, among other causes of action, breach of promissory note and breach of guaranty, Case No. 26STCV03434 (the "IDB Action"). In connection with the IDB Action, IDB filed an ex parte application for attachment against the Soofer Trust seeking a writ of attachment of the Soofer Trust's membership interest in AMIC, LLC ("AMIC"), and all funds traceable to any rights to payment, payment intangibles and general intangibles and other instruments from AMIC ("AMIC Funds"), in connection with the sale of certain real property owned by AMIC. The ex parte application was heard on March 4, 2026, and, at its conclusion, the court issued a temporary protective order enjoining R. Soofer and C. Soofer, as Trustees of Soofer Family Trust, from transferring, directly or indirectly, any interest in the following property: "Monies or funds received by AMIC, LLC, a California limited liability company, pursuant to any right to payment or distributions that Robby Soofer and Caroline Soofer, as the Trustees of the Soofer Family Trust, may have as members of AMIC, LLC, a California limited liability company" which total

approximately $4,500,000.00. The TPO remains in effect.

On or about March 3, 2026, Alpine commenced an action entitled Alpine Corporation vs. Israel Discount Bank of New York, Adv. No. 2:26-ap-01042-NB, in the Case, for declaratory relief; injunctive relief; amount of IDB claim; offset against IDB claim; and subordination ("Alpine Action"). In connection with the Alpine Action, Alpine sought a preliminary injunction against IDB prohibiting it from prosecuting the IDB Action. The parties have continued the hearing on the preliminary injunction pending settlement discussions.

IDB has extended a loan in the aggregate amount of $19,800,000.00 to IMA, LLC, a California limited liability company ("IMA") (the "IMA Loan") pursuant to the terms and conditions of that certain Loan Agreement dated May 26, 2022 ("IMA Loan Agreement"), and that certain Promissory Note in the original principal amount of $14,446,000.00 ("IMA Term Note"), and that certain bridge Promissory Note in the original principal amount of $5,354,000.00 (the "IMA Bridge Note," which together with the Term Note, as amended, otherwise modified, renewed or extended through the date hereof, and immediately prior to giving effect to this Amendment, are collectively referred to as the "Alpine IMA Note"), dated as of May 26, 2022, by IMA in favor of IDB. Alpine, among other parties, guaranteed repayment of the IMA Loan pursuant to that certain Guaranty dated May 26, 2022 ("Alpine IMA Guaranty"). The IMA Loan Agreement, IMA Term Note, IMA Bridge Note, and Alpine IMA Guaranty are collectively referred to herein as "IMA Loan Documents". IMA is the Debtors landlord and also related to the Debtor.

The IMA Note was secured by, among other things, those two certain Deeds of Trust, Security Agreements, Fixture Filings and Assignments of Leases and Rents (collectively, the "IMA Deed of Trust"), dated as of May 26, 2022, covering that certain parcel of real property located at 2680 Westhills Court, Simi Valley, California 93065, and more particularly described in the IMA Deed of Trust, and existing and future improvements located thereon (the "IMA Property").

On or about May 31, 2023, IMA, Guarantors and Bank entered into that certain First Amendment to Note and Loan Documents ("IMA First Amendment"). Pursuant to the First

Amendment, IMA and IDB agreed to amend certain provisions of the IMA Bridge Note and IMA Loan Documents, including an extension of the Maturity Date. The IMA Bridge Note and Deed of Trust securing same was subsequently assigned to the SBA. IDB remains the holder of the IMA Term Note and the Deed of Trust securing same and as of Petition Date the outstanding principal is $13,539,180.55 excluding accrued interest and fees.

IMA is in default under the IMA Term Note ("Existing IMA Default"), and has received a notice of default from IDB.

The Parties now desire to avoid the expenses and uncertainty of resolving their differences through litigation, and otherwise to resolve and settle the IDB Action and Alpine Action, on and subject to the terms, covenants, and conditions set forth herein, and to provide for such a settlement to be approved by the Bankruptcy Court under Fed. R. Bankr. P. 9019 and thereafter to be implemented by the Obligors, including without limitation eventually by a consensual chapter 11 plan of reorganization with respect to IDB's claims, that complies with the terms, covenants, and conditions in the Agreement ("Consensual Plan")

C. **Summary of the Settlement and Relevant Terms of the Agreement**.

The parties to the Agreement wish to resolve this matter without the time and expense of administrative litigation and enter into the Agreement for that purpose to enable the Debtor to move forward to approval of a plan of reorganization. The Agreement in relevant part provides:

**Forbearance**. IDB shall, forbear from enforcing its rights due to the Existing Defaults, including forbearing from foreclosing on its security interests in the Collateral, and from otherwise exercising its remedies against the Obligors or any other Collateral. IDB is willing to so forbear, but only subject to the terms and conditions as set forth in this Agreement pending an Event of Default under this Agreement ("Forbearance"), including as set forth below. In that regard, IDB is hereby granted immediate relief from the automatic stay as to all Collateral, with Rule 4001(a)(4) of the Federal Rules of Bankruptcy Procedure being waived, subject to the terms and conditions of this Forbearance. Any order of the Bankruptcy Court approving this Agreement shall incorporate and grant the relief from stay granted herein.

The Forbearance shall immediately and instantaneously terminate and cease without any further notice or demand at such time as a payment or performance Event of Default occurs under this Agreement and/or under any Consensual Plan (with respect to IDB only), after the expiration of any applicable Grace Period, or the termination of the Forbearance, whichever occurs first. For the avoidance of doubt, this Agreement and the Consensual Plan amend the existing Loan Documents and do not replace them, except as amended hereby. The provisions of the Loan Agreement are deemed amended upon the Effective Date as provided in Schedule A.

**Repayment of Loan**. The Loan shall be paid as follows:

- Alpine shall pay to IDB on the Loan not less than $40,000.00 per month allocated to the Term Loan, commencing no later than May 31, 2026, and continuing on the same day of each and every month thereafter until the Term Loan is paid off. (**As of the date of the Motion, the Term Loan has been paid off**).
- Commencing on September 15, 2026, and continuing on the same day of each and every month thereafter, Alpine shall pay to IDB on the LOC Note or the Amended Note, as the case may be, the sum of $110,000.00 which shall be allocated first to interest and then to principal to the LOC Note and then after the Effective Date to the Amended Note, except upon the occurrence of an Event of Default, in which case it shall be applied first to fees and costs, second to interest, and third to principal.
- Within three (3) days after the Effective Date, the Soofer Trust shall cause to be paid to Lender from the AMIC Funds the sum of $3,250,000.00. The funds for such payment is from the sale of the real property located at 13001 Temple Avenue, City of Industry, California 91746, which was previously owned by AMIC. The AMIC Funds are on deposit with Nevada State Bank and are subject to the TPO issued by the Court in the IDB Action which was requested by Lender. The balance of the AMIC Funds shall be used as follows: $750,000.00 to be loaned to Alpine by AMIC subject to Bankruptcy Court approval through the Motion for Financing filed by Alpine in the Case which Lender shall consent to, and the remaining portion of the AMIC Funds to R. Soofer in his individual capacity or such entity he designates, or all of such AMIC Funds shall be distributed to R. Soofer as a distribution for the same purpose, i.e., $750,000.00 to be provided solely to Alpine and the remainder to R. Soofer. If the AMIC Funds

are distributed to R. Soofer, at least $750,000.00 must be provided to Alpine as a "new value" contribution, and Lender consents to R. Soofer and/or AMIC characterizing such contribution as a "new value" contribution to fund the Consensual Plan. Alternatively, if the $750,000.00 is loaned directly from AMIC or R. Soofer to Alpine, the $750,000.00 loan shall be subordinated to all payments due to Lender by Alpine as either a secured or an unsecured creditor and no payments may be made on the $750,000.00 loan by Alpine until such time that Lender has been paid in full in both of its capacities as a secured and an unsecured creditor of Alpine.

**Tariff Refunds**. As a result of the United States Supreme Court case Learning Resources, Inc. v. Trump, Alpine is entitled to certain tariff refunds ("Tariff Refunds"). Pursuant to the terms of the Security Agreement, IDB has a security interest in, among other collateral, the "General Intangibles" of Debtor and Related Parties. Therefore, IDB asserts its rights in and to the Tariff Refunds. From the Tariff Refunds, IDB shall receive the following:

- No later than 90 days from the Effective Date as defined in paragraph 14, below (the "Tariff Payment Effective Date"), IDB shall receive $400,000.00 in Tariff Refunds;
- No later than 180 days from the Tarriff Payment Effective Date, IDB shall receive $200,000.00 in Tariff Refunds;
- No later than one (1) year from the Tariff Payment Effective Date, IDB shall receive $150,000.00 in Tariff Refunds.

Notwithstanding the foregoing, in the event there is a shortfall in any of the required payments under clauses (i)-(iii) which shall be determined one (1) year after the Tariff Payment Effective Date, the shortfall ("Shortfall") shall be added to the principal balance of the Amended Note, amortized over the remaining term of the Amended Note and such increase shall be added to the monthly payment required to be made above, unless the Shortfall is paid by subsequent payment prior to the expiration of the one year time peiod. The payment on the Tariff Refunds received by IDB will first be applied to any outstanding principal and then to interest on the Amended Note.

**Interest on the Amended Note and Term of Amended Note**. The LOC Note shall be extended for five (5) years (from the Effective Date to approximately September 15, 2031) and shall be referred to herein as the "Amended Note", which is to be adjusted when the Effective

Date occurs (the "Amended Term"). Interest on the Amended Note shall be fixed at five percent (5%) per annum, but subject to the default rate of interest provided for in the Amended Note if there is an Event of Default hereunder, which default rate of interest the parties have negotiated. Upon Bankruptcy Court approval of this Agreement, Alpine shall execute and return the Amended Note to Lender.

**Allowance of Claims and Payment per Consensual Plan**. Upon entry of the Rule 9019 Order, the LOC POC shall be deemed allowed. The IMA Guaranty POC and Term POC shall be deemed allowed, however, they will not be paid pursuant to the Consensual Plan. Lender will be able to vote on the Consensual Plan with respect to the secured portion of the LOC POC, the unsecured portion of the LOC POC up to the amount of at least $1,253,252.47 not including attorneys' fees and costs and other expenses, the IMA Guaranty POC, and, to the extent it remains outstanding as of the voting record deadline, the Term POC. The unsecured portion of the LOC POC and the IMA Guaranty POC will be treated as general, unsecured claims under the Consensual Plan classified with all other ordinary, general, unsecured creditors, eligible to vote on the Consensual Plan, and, except for the IMA Guaranty POC, will share in pro rata payment with the other, ordinary, general, unsecured creditors in its class. Lender will have up to 30 days after the Plan Effective Date, to either amend the LOC POC or file a new proof of claim to specify the unsecured portion of the its LOC POC and include attorneys' fees, costs, other expenses, and any post-petition interest. The estimated unsecured portion of the LOC POC is calculated by taking the difference between the LOC POC, after crediting and reducing it for $4,000,000.00, and $9,000,000.00.

**Terms and Conditions Upon Which Discount Shall Be Made on Amended Note**. IDB shall discount the principal balance of the Loan upon Obligors satisfying the following terms and conditions:

- At the end of each of the first three (3) years of the Amended Term, if Alpine has made each of the monthly payments required for such year, as and when due, and Obligors are not otherwise in default of their obligations to Lender, Lender shall discount the principal amount of the Loan by an additional $500,000.00 per year; provided, however, Debtor shall only be entitled to the discount on the condition that (i) (a) the IMA Loan is paid in accordance with the IMA Forbearance Agreement. on or before two (2) years from the Effective Date, or (b) in the event that the IMA Loan is not paid on or before two (2) years from the Effective Date,

Obligors do not interfere with or otherwise delay any enforcement proceedings by Lender, and if a filing of a Chapter 11 bankruptcy case is commenced by IMA, Obligors do not oppose any motion by Lender to obtain relief from the automatic stay, and (ii) at all times IMA complies with the IMA Loan provision of the Agreement ("IMA Compliance Discount Conditions").

- In the event the Amended Note is paid in full after thirty-six (36) months from the Effective Date but before the end of the forty-second (42nd) month from the Effective Date, in addition to the eligibility for the $500,000.00 discounts referenced above, if Alpine makes each of the monthly payments required during the last six (6) month period, and Obligors are not otherwise in default of their obligations under this Agreement, the principal balance of the Loan shall be reduced by an additional $250,000.00, and for the avoidance of confusion, in the event Alpine pays off the Loan at any time during the first forty-two (42) months, and Obligors are not otherwise in default of their obligations hereunder, it shall be entitled to all of the discounts referenced in this paragraph as long as the IMA Compliance Discount Conditions have been satisfied as of the date the Loan is paid off. Further, in the event the Amended Note is paid in full on or before 30 months from the Effective Date and Obligors are not otherwise in default of their obligations hereunder, Lender shall consider each of the annual $500,000.00 earned resulting in an aggregate discount on the Amended Note of $1,500,000.00. In addition to the foregoing discount, Lender shall reduce the outstanding principal balance on the Amended Note by an additional $500,000.00, for a total discount of $2,000,000.00.
- Upon the Effective Date and Lender's receipt of the not less than $4,000,000.00 (consisting of the AMIC Funds of $3,250,000.00 and/or any combination of the Tariff Refunds, the Litigation Recoveries, Third Party Actions recoveries, and the $110,00.00 per month above, whether the $110,000.00 per month is applied to principal or interest under the LOC Note or Amended Note, as the case may be), the Loan will be reduced to the principal balance of $9,000,000.00 (as of September 16, 2026) and payments received from the Tariff Refunds, the Litigation Recoveries, Third Party Actions recoveries, and the $110,000.00 per month above shall be applied to the Amended Note, as long as Obligors are not otherwise in

default of their obligations hereunder, which Shortfall shall be added to the principal balance of $9,000,000.00.

**Amendment to Note and Amended Security Agreement**. The Note shall be amended pursuant to the Amended Note. The Security Agreement shall be supplemented pursuant to the Amendment to Security Agreement, ("Amended Security Agreement"). The Amended Security Agreement is cumulative to, and does not replace, the Security Agreement. The Amended Security Agreement shall include the Third Party Actions, the Litigation Recoveries, the Tariff Refunds, and all proceeds, substitutions, and replacements of the foregoing, among other things. Any order of the Bankruptcy Court approving this Agreement shall approve the granting of the liens provided for in this Agreement and the Amended Security Agreement in a manner satisfactory to Lender.

**Litigation Proceeds**. Alpine has currently commenced actions ("Pending Actions") and may, in the future commence actions against parties for preferential or other voidable transfers and non-bankruptcy law claims in the Case, against merchant cash advance IDBs and other third parties for damages, losses and other recoveries pursuant to 11 U.S.C. §§ 506(c), 541 – 553, 555 – 557, 559 – 561, and 724 ("Future Actions" and together with "Pending Actions", individually and collectively, "Third Party Actions").

Alpine shall share recoveries from the Third Party Actions with IDB ("Litigation Recoveries"), as follows:

- The first recovery monies shall be paid to Alpine to reimburse it for legal fees and costs incurred by Alpine in such Third Party Action;
- The remaining recovery monies shall be split equally (when received) with Alpine receiving 50% of such recovery and IDB receiving 50% of such recovery, with such payment to IDB to be first applied to any outstanding principal and then to interest on the Amended Note.
- The recovery split by and between Alpine and IDB does not include Third Party Actions of Alpine for the collection or recovery of accounts receivables.

**Additional Security for Loan; Soofer Trust Real Estate Conditions**. The following additional security shall be provided for the Loan:

- A collateral assignment by the Soofer Trust of its economic interest in Imperial Hwy, LLC, a California limited liability company ("Imperial"), including, without

limitation, income, distributions, dividends, and any other payments made or to be made by Imperial by virtue of the Soofer Trust membership interest in Imperial.

- A collateral assignment by R. Soofer and C. Soofer (individually, and collectively, the "Soofers") of their economic interest in CMA, LLC, a California limited liability company ("CMA"), including, without limitation, income, distributions, dividends, and any other payments made or to be made by CMA by virtue of the Soofers membership interest in CMA.

**The IMA Loan.**

IMA has failed to make the monthly payments required under the IMA Loan and is currently in default of its obligations under the IMA Loan. Concurrently with the execution of this Agreement, IMA, among others, and IDB are entering into that certain Forbearance Agreement, Consent and Release ("IMA Forbearance Agreement") which is attached to the Agreement hereto and incorporated herein by this reference.

- Among other provisions, the IMA Forbearance Agreement provides that (i) IMA shall sell the IMA Property no later than two (2) years from the Effective Date, (ii) IMA shall keep insurance in place for the IMA Property satisfactory to Lender, naming Lender as loss payee and additional insured, and (iii) IMA shall maintain the IMA Property in a commercially reasonable manner consistent with the requirements of the IMA Loan Documents. IMA shall not be required to keep its real estate taxes and assessments secured by the IMA Property current as long as a tax foreclosure sale is not noticed as a result of such non-compliance.
- IMA shall execute the IMA Forbearance Agreement acknowledging and approving the provisions of this Agreement and the terms of a forbearance upon which Lender shall defer the commencement of enforcement proceedings against IMA and its guarantors (other than Alpine) as a condition to the closing of this Agreement.

**Controlling Document**. Except as specified herein, all of the terms, covenants, and conditions of the Loan Documents, and each of them, shall remain in full force and effect, as shall all provisions in any stipulation and/or order of the Bankruptcy Court concerning the use of cash collateral ("Cash Collateral"), during the Case.

**Conditions Precedent to the Effectiveness of this Agreement**. The obligations of IDB under this Agreement are expressly conditioned upon each of the following having occurred, or IDB having received what is required, or such requirements or deadlines have been deemed

satisfied or waived or extended in writing by IDB in its sole opinion and judgment (the "Effective Date"). If all conditions have been previously satisfied, and unless extended by IDB, the Effective Date shall occur on the 14th day after the Bankruptcy Court enters the Rule 9019 Order but which in no event shall occur later than October 31, 2026, 14 days elapsing after entry of the Rule 9019 Order by the Bankruptcy Court; and

**IDB Plan Treatment**. The Obligors, and each of them, shall and hereby do agree that the provisions of the Agreement are and shall be IDB's treatment in the Consensual Plan or other plan of reorganization. IDB agrees to vote in favor of the Consensual Plan in all classes upon which it will be a member.

**Dismissal of the Actions**. Within three (3) business days of the Effective Date, IDB shall dismiss the IDB Action without prejudice and Debtor shall dismiss the Alpine Action with prejudice. The parties shall cooperate to continue the deadlines and the TPO until the dismissals take effect.

**No Surcharge Against IDB's Collateral**. No Obligor, nor any of them, shall be entitled to recover upon any claim under 11 U.S.C. §§ 506(c), 552(b), or other applicable law against or surcharging any Collateral or Cash Collateral or IDB's interest therein for fees, costs, and/or expenses arising out of and/or appertaining to the Case or any proceeding to which the Case.

**IDB will receive a General Release by Obligors under the Agreement**.

**CONSULT THE ATTACHED AGREEMENT FOR THE FULL TERMS AND CONDITIONS OF THE AGREEMENT.**

The Related Parties were included in the Loan Documents as they were contemplated at that time to operate and potentially make use of the Loan. Garden Plus was contemplated to be engaged in the organization and promotion of merchandise on behalf of the Debtor, as well as Aspen Peak. Aspen Peak is a worldwide online retailer of merchandise for the home, garden, and patio. Garden Plus has not substantively operated for a number of years, and Aspen Peak's operation are minimal.

During the course of the negotiations with IDB, neither of the Related Parties were considered to or expected to receive any compensation or additional benefit from the Agreement other than what is set forth therein. The Related Parties have no further claims against the Debtor based on the Agreement. This was based upon the rationale that they were merely included in the

Agreement as they were parties to the Loan Documents. Further, other than IMA having claims against the Debtor based upon its Lease with the Debtor, IMA will not have any additional claims against the Debtor based upon the Agreement.

AMIC and or Soofer, as discussed previously, will be lending the Debtor $750,000 pursuant to the Motion for Order Approving Financing as Unsecured Credit Allowable as an Administrative Expense (Doc # 241), and the additional payment to IDB by AMIC to pay down the Loan will also be considered a loan by AMIC to the Debtor. Both obligations will either be subordinated or considered "new value" for purposes of the Debtors plan of reorganization.

There is good and sufficient cause for granting this Motion. Simply put, the Agreement is in the best interests of the estate and its creditors because it will resolve the claims of the Debtor against the IDB, payment of claims by the IDB to the bankruptcy estate, while avoiding the risks and costs associated with litigation. Therefore, as set forth below, each of the factors necessary to approve settlements in this Circuit are present in this case and, as a result, the settlement should also be found to be in the best interests of the estate and approved by the Court.

## II.

## THE COURT SHOULD APPROVE THE PROPOSED SETTLEMENT BETWEEN THE DEBTOR AND IDB

A compromise of the kind contemplated by the Debtor is permissible pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure. Rule 9019(a) specifically provides that, after the filing of a duly noticed motion, "the court may approve a compromise or settlement". Here, the Debtor has filed this Motion and provided the requisite notice in accordance with Rule 9019 and the Local Bankruptcy Rules adopted by this Court. Therefore, this Court has the authority to consider, and ultimately grant, the relief requested by the Debtor through this Motion.

### The Proposed Settlement is in the Best Interests of the Estate.

Compromises are generally favored by Bankruptcy Courts. However, while compromises are generally favored, it is still necessary that this Court undertake to determine whether or not the proffered settlement or compromise of the controversy is in the best interests of the estate. The standards for making this determination were enumerated by the United States Supreme Court in

Prospective Committee Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). In TMT, the Supreme Court stated that,

> Compromises are 'a natural part of the process of reorganization.' In administering the reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts. At the same time, however, it is essential that every important determination and reorganization proceeding receive the informed and independent judgment of the Bankruptcy Court. There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the Bankruptcy Judge has apprised himself of all the facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment that might be obtained, and all other facts relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

Id., at 424-25.

The instructions of the Supreme Court in TMT were further elaborated upon by the Ninth Circuit in In re A&C Properties, 784 F.2d 1377 (9th Cir. 1986), where a debtor sought approval of a settlement with respect to his administration of the debtor's assets. As the Ninth Circuit stated in A&C Properties,

> The purpose of a compromise agreement is to allow the Debtor and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims. (Citations omitted).

> The law favors compromise and not litigation for its own sake … and as long as the Bankruptcy Court amply considered the various factors that determined the reasonableness of the compromise, the Court's decision must be affirmed.

Id., at 1381.

It is necessary for the Court to determine whether a proposed settlement by a trustee (debtor in possession) is reasonable, given the particular circumstances of a case. See, In re Equity Funding Corporation of America, 529 F.2d 1274 (9th Cir. 1975). The Court in A&C Properties provided further guidance in determining whether or not this Court should approve a proposed Agreement when it is stated that:

> In determining the fairness, reasonableness and adequacy of a proposed settlement agreement, the Court must consider:
>
> (a) The probability of success in litigation;
>
> (b) The difficulties, if any, to be encountered in the manner of collections;
>
> (c) The complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and
>
> (d) The paramount interest of creditors.

Obviously, the decision as to whether a compromise should be accepted or rejected lies within the sound discretion of this Court. In re Carson, 82 B.R. 847 (Bankr. S.D. Ohio 1987); In re Hallet, 33 B.R. 564 (Bankr. D. Me. 1983); In re Mobile Air Drilling Co., Inc., 53 B.R. 605 (Bankr. N.D. Ohio 1985); In re Hydraulic Enterprise, Inc., 58 B.R. 363 (Bankr. D. R.I. 1986).

A Court, however, should not substitute its own judgment for the judgment of the Debtor. In the Matter of Carla Leather, Inc., 44 B.R. 457 (Bankr. S.D.N.Y. 1984). A Court, in reviewing a proposed settlement, is not "to decide the numerous questions of law and fact … but rather to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness". See, In re W.T. Grant & Co., 699 F.2d 599, 608 (2nd. Cir. 1983), cert. denied, 464 U.S. 822 (1984). A "mini-trial" on the merits of the claims which are the subject of the

compromise is not required and should not be undertaken by the Court. In re Blair, 538 F.2d 849 (9th Cir. 1976). Neither is an exhaustive examination into the disputed claims required. In re Walsh Construction, Inc., 669 F.2d 1325 (9th Cir. 1982).

Rather, the Court must appraise itself of all of the facts necessary for an objective and intelligent decision on the validity of claims to be compromised. This also involves the Court's reaching an intelligent, objective and educated evaluation of the proposed compromise. In re AWECO, 725 F.2d 293, reh'g denied, 732 F.2d 941 (5th Cir. 1984). In a practical sense, this requires the Court not to resolve the issues to be compromised, but to identify them so that the bounds of reasonableness can be seen with some clarity.

In this regard, the Debtor's burden is to persuade the Court that the compromise is a reasonable exercise of the Debtor's business judgment. In this case, the Debtor began pursuing and examining information regarding the potential claims by and against IDB before the bankruptcy case was filed and throughout the bankruptcy case. After a thorough examination and analysis of the value of the claims by and against IDB, engaging in extensive litigation and contested matters in this bankruptcy case, both the Debtor and IDB employing financial consultants to thoroughly analyze each of the respective parties claims and the Debtors ability to operate and continue operating into the future, participating in extensive negotiations, correspondence, reviewing and analyzing documents supplied by each Party, and ultimately many iterations of the settlement agreement which involved non-debtor parties as well, the Debtor elected to enter into the proposed settlement based upon (1) the amount of time to resolve the litigation and the costs to defend and continue with the litigation and contested matters, (2) the potential risks of the litigation and contested matters concerning the estate's property interest, and the net benefit available to the estate, (3) the collectability of the settlement, and (4) the settlement would put the Debtor in a better position for a distribution on allowed claims and provide funds to utilize in its reorganization efforts, and reduce its obligations to IDB dramatically.

As will be demonstrated in more detail, the Debtor submits that under the applicable standards adopted by the Ninth Circuit, the settlement should be approved.

**The Factors Necessary to Approve the Settlement are Present in this Case.**

As noted earlier, in determining whether to approve the settlement, the standards described above do not require a total and complete analysis of the entire history of the disputed or alleged claims. Rather, the Court need only determine if the proposed compromise falls within the bounds of reasonableness under the circumstances. It is not even necessary that the proposed compromise be the best possible compromise, only that it be reasonable.

In this case, even if the Court rejected the settlement and forced the Debtor to continue with the litigation and contested matters against the IDB, the result would in all likelihood be no more beneficial to the Estate than the terms set forth in the Agreement. In fact, the result could be more deleterious because the Debtor believes that the terms of the Agreement reflect the best-case resolution of the Estate's interests. Moreover, the Debtor is convinced that the costs of litigation and potential outcome, and continuing costs of administration, if such a course were pursued, would simply diminish any return to the Estate and place it in serious risk of obtaining a far less favorable outcome.

**<u>The Probability of Success</u>.**

One of the primary factors which the Debtor considered in this decision to enter into the settlement was an analysis of the potential outcome of the Debtors claims against IDB and IDB's claims against the Debtor and their respective defenses. Bearing this in mind, the Debtor considered the applicability of the relevant law to the facts of this case, and the relative strengths and weaknesses in the position of each Party. After recognizing the difficult road ahead of it, the Debtor concluded that there was no assurance of the Debtor's success against IDB or obtaining a greater result on the myriad of issues between the parties than that as set forth herein. Because the Agreement resolves the disputes with the IDB and provides for a significant roadmap to recovery of the Debtor and potentially a consensual plan of reorganization, it is very positive for the estate. Consequently, the Debtor decided to settle the disputed with IDB according to the Agreement.

**<u>The Difficulties, if any to be encountered in the Manner of Collections</u>.**

The Debtor was also concerned with the amount of time it would take to complete the multiple litigation matters and resolve the various contested matters by and between IDB and the Debtor, and the costs of the delay would have on its reorganization. Even if successful, the Debtor

could still be faced with a lengthy litigation and court process. As a result, the potential delay to creditors, the risks to its cash flow by incurring additional costs of defense, and the potential upheaval to the Debtor's reorganization process convinced the Debtor that the proposed settlement was in the best interest of creditors.

**The Complexity of the Potential Claims, and the Attendant Time, Energy and Inconvenience**.

The amount of time it would take any action to run its course, the Debtor determined that settlement according to the terms of the Agreement was the proper course for resolving the existing and potential disputes between the Parties and insuring a return to creditors by reducing its debt to IDB and obtaining financing for its reorganization efforts. The potential defenses and claims involved herein necessarily involve numerous factual and legal disputes which are extremely complex issues and would be litigated. They concern very complex issues which are or may be interrelated and potentially other issues, and unsettled legal issues. As such, the Debtor would be required to conduct further discovery, many contested hearings and financial advisor support, before these matters could be resolved. As a result, any further litigation and contested matters between the Debtor and IDB would be costly and time consuming. Coupled with the amount of time it would take any action to run its course, and the difficulty with obtaining information and support for each parties respective position in the various matters, the Debtor determined that settlement of the claims according to the terms of the Agreement was the proper course for resolving the existing disputes between the Parties.

**The Paramount Interest of Creditors**.

In analyzing the benefits and risks associated with the settlement, the Debtor consistently considered the interests of the Estate's creditors. When the interests of all creditors of the Estate were factored into the equation, it became clear that settlement in accordance with the terms of the Agreement were in the best interests of the Estate. Settlement according to the terms of the Agreement obviates the expense, delays and uncertainty inherent in pursuing another course of action, while allowing the case to move forward and creditors the opportunity to realize a return on their claims in the near future. Rather than expend a significant amount of administrative

expenses, the Debtor believes that the settlement, which will likely provide for distributions to creditors through a significant infusion of funds and reduction of debt, while keeping administrative expenses at a minimum, is a result creditors should and would favor.

As addressed repeatedly, the Debtor believes that the settlement embodied in the Agreement is in the best interests of all parties and should be approved by the Court. Consequently, the Court should defer to the business judgment of the Debtor and approve the proposed settlement.

## IV.

## CONCLUSION

Based on the foregoing, the Debtor respectfully requests that the Motion be granted and in all respects, and for such other and further relief as the Court deems just and proper.

DATED: September 4, 2026

**KOGAN LAW FIRM, APC**
MICHAEL S. KOGAN

By: /s/Michael S. Kogan
Michael S. Kogan
Attorneys for Debtor

## DECLARATION OF ROBBY SOOFER

I, Robby Soofer, declare and say as follows:

1. I am the President of Alpine Corporation (the "**Debtor**" or "**Alpine**"), the debtor and debtor in possession herein in this bankruptcy case. Except where otherwise stated below, I have personal knowledge of the facts set forth below and, if called as a witness, I would and could competently testify thereto. In my capacity as the President of the Debtor, I am responsible for or somebody under my control or supervision, among other things, the Debtor's accounting and finance functions, including the preparation of periodic financial statements and financial projections. Either I or persons under my control maintain the Debtor's financial books and records in the ordinary course of its business, in a consistent and organized manner.

2. I make this declaration in support of the Motion For Approval of Settlement Agreement – Israel Discount Bank of New York (the "**Motion**"), Alpine Corporation (the "**Debtor**" or "**Alpine**"), Aspen Peak Corporation ("**Aspen Peak**"), Garden Plus Sales ("**Garden Plus**") (the Debtor, Aspen Peak and Garden Plus will collectively be referred to herein as the "**Related Parties**"), Robby Soofer, ("**R. Soofer**"), Caroline Neman Soofer, ("**C. Soofer**"), and Robby Soofer and Caroline Neman Soofer, as Trustees of the Soofer Family Trust ("**Soofer Trust**," together with R. Soofer and C. Soofer, individually and collectively, the "**Guarantor**"), on the one hand, and Israel Discount Bank of New York ("**IDB**" or "**Lender**" or "**Bank**") (with Debtor, Related Parties, Guarantor and IDB being referred to herein, collectively, as the "**Parties**"), in which the Debtor, the Related Parties and Guarantor and IDB have resolved the many claims by and between them. The terms of the compromise are discussed below, and are embodied in the Settlement Agreement (the "**Agreement**"), attached as Exhibit "A" to the Motion and incorporated herein by this reference.[3].

3. The Debtor believes that the settlement embodied in the Agreement is in the best interests of all parties and should be approved by the Court. Consequently, the Court should defer

---

[3] The Motion includes the Settlement Agreement and the Forbearance Agreement, Consent and Release. The additional exhibits will be provided to the Court prior to the hearing on the Motion.

to the business judgment of the Debtor and approve the proposed settlement. Therefore, the Motion should be approved.

4. The settlement avoids the risks and costs associated with litigation, and provide certainty. As explained further below, the Agreement essentially provide for resolution of the issues between the parties. Therefore, as set forth in detail below, the Court should grant the Motion and approve the Agreement because it is reasonable, fair, and in the best interests of the estate.

5. IDB extended credit facilities to Debtor and the Related Parties in 2021. Thereafter, in 2023, Debtor, the Related Parties and IDB entered into that certain Amended and Restated Loan Agreement dated as of April 21, 2023 and effective as of April 14, 2023 (and together with all amendments to and modifications thereof, the "Loan Agreement"). In connection with the Loan Agreement, IDB extended (i) a term loan in the aggregate principal amount of $1,436,390.12 to Debtor (the "Term Loan") and the Related Parties, and (ii) a revolving line of credit in the aggregate principal amount of up to $16,000,000.00 to Debtor and the Related Parties (the "Revolving Line of Credit," and together with the Term Loan, individually and collectively, the "Loan").

6. As part of the Revolving Line of Credit, Debtor and the Related Parties executed to and in favor of IDB that certain Revolving Demand Promissory Note dated as of October 15, 2021 in the original maximum principal face amount of $20,000,000.00 (and together with all amendments to and modifications thereof, the "LOC Note"), which was subsequently reduced to $16,000,000.00.

7. As part of the Term Loan, Debtor and the Related Parties executed to and in favor of IDB that certain Amended and Restated Term Loan Promissory Note dated as of April 21, 2023 in the maximum principal face amount of $1,436,390.12 (and together with all amendments to and modifications thereof, the "Term Note").

8. In connection with the Loan, Debtor and the Related Parties also executed and delivered to and in favor of IDB, the following additional documents, among others:

9. Security Agreement dated October 15, 2021 ("Security Agreement"), executed by

Debtor and the Related Parties, in favor of IDB. The security interests granted by the Security Agreement are perfected with a first position lien pursuant to (a) as to Alpine, the UCC Financing Statement filed with the California Secretary of State on October 18, 2021, as File No. U210094255932, (b) as to Aspen Peak, the UCC Financing Statement filed with the California Secretary of State on October 18, 2021, as File No. U210094258433, and (c) as to Garden Plus, the UCC Financing Statement filed with the California Secretary of State on October 18, 2021, as File No. U210094260124 (the "Financing Statements").

10. Payment and performance of Debtor's and the Related Parties indebtedness and obligations in connection with the Loan, was and is guaranteed by Guarantor, who each delivered to and in favor of IDB, a Guaranty Agreement dated as of October 15, 2021 (individually and collectively, "Guaranty"). (Debtor, the Related Parties and Guarantor shall be referred to herein, individually and collectively, as "Obligors".)

11. Debtor, the Related Parties and IDB entered into a First Amendment to Amended & Restated Loan Agreement dated August 28, 2024 (and as acknowledged and agreed to by Guarantor, the "First Amendment"), Second Amendment and Limited Waiver to Amended & Restated Loan Agreement dated April 28, 2025 (and as acknowledged and agreed to by Guarantor, the "Second Amendment"), Third Amendment and Limited Waiver to Amended & Restated Loan Agreement dated May 30, 2025 (and as acknowledged and agreed to by Guarantor, the "Third Amendment"), and Fourth Amendment and Limited Waiver to Amended & Restated Loan Agreement dated August 19, 2025 (and as acknowledged and agreed to by Guarantor, the "Fourth Amendment"), where, among other things, the Revolving Maturity Date was ultimately extended to October 15, 2025.

12. Pursuant to the Security Agreement, Debtor granted to and in favor of IDB, a first priority security interest in and lien upon all personal property assets of Debtor as described in the Security Agreement (the "Security Agreement Collateral"), to secure, without limitation, payment and performance of the indebtedness and obligations under and in connection with the Loan, including the LOC Note and the Term Note. IDB's security interest in the Security Agreement Collateral was and is perfected under applicable law.

13. The Loan Agreement, the LOC Note, the Term Note, the Security Agreement, the Financing Statements, the Guaranty, the First Amendment, the Second Amendment, the Third Amendment, the Fourth Amendment and all other assignments, agreements, instruments and other documents executed by Debtor and the Related Parties or Guarantor in connection with the Loan shall at times hereinafter be referred to collectively as the "Loan Documents". Debtor defaulted under the Loan Documents ("Existing Defaults").

14. As a result of the Existing Defaults, IDB, at its option, could have commenced enforcement of its rights and remedies under the Loan Documents and applicable law. However, on January 5, 2026 ("Petition Date"), Alpine filed a chapter 11 bankruptcy petition in the United States Bankruptcy Court ("Bankruptcy Court"), Case Number 2:26-BK-10067-NB (the "Case").

15. On July 21, 2026, IDB filed Poof of Claim No. 59 for the Alpine IMA Guaranty ("IMA Guaranty POC") (defined in Recital R. below), Proof of Claim No. 60 for the LOC Note ("LOC POC"), and Proof of Claim No. 61 for the Term Note ("Term POC") (collectively IMA Guaranty POC, LOC POC and Term POC, "Proofs of Claim").

16. IDB has been granted replacement liens in the Case ("Replacement Lien Collateral," and together with the Security Agreement Collateral, the "Collateral").

17. On or about February 2, 2026, IDB commenced an action in the Los Angeles Superior Court entitled Israel Discount Bank of New York, a New York banking corporation v. Aspen Plus Sales, a California corporation; Garden Plus Sales, a California corporation; Caroline Neman Soofer, an individual; Robby Soofer and Caroline Neman Soofer, as Trustees of the Soofer Family Trust, etc., et al., for, among other causes of action, breach of promissory note and breach of guaranty, Case No. 26STCV03434 (the "IDB Action"). In connection with the IDB Action, IDB filed an ex parte application for attachment against the Soofer Trust seeking a writ of attachment of the Soofer Trust's membership interest in AMIC, LLC ("AMIC"), and all funds traceable to any rights to payment, payment intangibles and general intangibles and other instruments from AMIC ("AMIC Funds"), in connection with the sale of certain real property owned by AMIC. The ex parte application was heard on March 4, 2026, and, at its conclusion, the court issued a temporary protective order enjoining R. Soofer and C. Soofer, as Trustees of Soofer

Family Trust, from transferring, directly or indirectly, any interest in the following property: "Monies or funds received by AMIC, LLC, a California limited liability company, pursuant to any right to payment or distributions that Robby Soofer and Caroline Soofer, as the Trustees of the Soofer Family Trust, may have as members of AMIC, LLC, a California limited liability company" which total approximately $4,500,000.00. The TPO remains in effect.

18. On or about March 3, 2026, Alpine commenced an action entitled Alpine Corporation vs. Israel Discount Bank of New York, Adv. No. 2:26-ap-01042-NB, in the Case, for declaratory relief; injunctive relief; amount of IDB claim; offset against IDB claim; and subordination ("Alpine Action"). In connection with the Alpine Action, Alpine sought a preliminary injunction against IDB prohibiting it from prosecuting the IDB Action. The parties have continued the hearing on the preliminary injunction pending settlement discussions.

19. IDB has extended a loan in the aggregate amount of $19,800,000.00 to IMA, LLC, a California limited liability company ("IMA") (the "IMA Loan") pursuant to the terms and conditions of that certain Loan Agreement dated May 26, 2022 ("IMA Loan Agreement"), and that certain Promissory Note in the original principal amount of $14,446,000.00 ("IMA Term Note"), and that certain bridge Promissory Note in the original principal amount of $5,354,000.00 (the "IMA Bridge Note," which together with the Term Note, as amended, otherwise modified, renewed or extended through the date hereof, and immediately prior to giving effect to this Amendment, are collectively referred to as the "Alpine IMA Note"), dated as of May 26, 2022, by IMA in favor of IDB. Alpine, among other parties, guaranteed repayment of the IMA Loan pursuant to that certain Guaranty dated May 26, 2022 ("Alpine IMA Guaranty"). The IMA Loan Agreement, IMA Term Note, IMA Bridge Note, and Alpine IMA Guaranty are collectively referred to herein as "IMA Loan Documents". IMA is the Debtors landlord and also related to the Debtor.

20. The IMA Note was secured by, among other things, those two certain Deeds of Trust, Security Agreements, Fixture Filings and Assignments of Leases and Rents (collectively, the "IMA Deed of Trust"), dated as of May 26, 2022, covering that certain parcel of real property located at 2680 Westhills Court, Simi Valley, California 93065, and more particularly described in

the IMA Deed of Trust, and existing and future improvements located thereon (the "IMA Property").

21. On or about May 31, 2023, IMA, Guarantors and Bank entered into that certain First Amendment to Note and Loan Documents ("IMA First Amendment"). Pursuant to the First Amendment, IMA and IDB agreed to amend certain provisions of the IMA Bridge Note and IMA Loan Documents, including an extension of the Maturity Date. The IMA Bridge Note and Deed of Trust securing same was subsequently assigned to the SBA. IDB remains the holder of the IMA Term Note and the Deed of Trust securing same and as of Petition Date the outstanding principal is $13,539,180.55 excluding accrued interest and fees.

22. IMA is in default under the IMA Term Note ("Existing IMA Default"), and has received a notice of default from IDB.

23. The Parties now desire to avoid the expenses and uncertainty of resolving their differences through litigation, and otherwise to resolve and settle the IDB Action and Alpine Action, on and subject to the terms, covenants, and conditions set forth herein, and to provide for such a settlement to be approved by the Bankruptcy Court under Fed. R. Bankr. P. 9019 and thereafter to be implemented by the Obligors, including without limitation eventually by a consensual chapter 11 plan of reorganization with respect to IDB's claims, that complies with the terms, covenants, and conditions in the Agreement ("Consensual Plan").

24. The attached Agreement contains the full terms and conditions of the Agreement, and I have been intimately involved in the negotiations and have reviewed the Agreement and believe it is very favorable to the Debtor.

25. The Related Parties were included in the Loan Documents as they were contemplated at that time to operate and potentially make use of the Loan. Garden Plus was contemplated to be engaged in the organization and promotion of merchandise on behalf of the Debtor, as well as Aspen Peak. Aspen Peak is a worldwide online retailer of merchandise for the home, garden, and patio. Garden Plus has not substantively operated for a number of years, and Aspen Peak's operation are minimal.

26. During the course of the negotiations with IDB, neither of the Related Parties were

considered to or expected to receive any compensation or additional benefit from the Agreement other than what is set forth therein. The Related Parties have no further claims against the Debtor based on the Agreement. This was based upon the rationale that they were merely included in the Agreement as they werc parties to the Loan Documents. Further, other than IMA having claims against the Debtor based upon its Lease with the Debtor, IMA will not have any additional claims against the Debtor based upon the Agreement.

27. AMIC and or Soofer, as discussed previously, will be lending the Debtor $750,000 pursuant to the Motion for Order Approving Financing as Unsecured Credit Allowable as an Administrative Expense (Doc # 241), and the additional payment to IDB by AMIC to pay down the Loan will also be considered a loan by AMIC to the Debtor. Both obligations will either be subordinated or considered "new value" for purposes of the Debtors plan of reorganization.

28. There is good and sufficient cause for granting this Motion. Simply put, the Agreement is in the best interests of the estate and its creditors because it will resolve the claims of the Debtor against the IDB, payment of claims by the IDB to the bankruptcy estate, while avoiding the risks and costs associated with litigation. Therefore, as set forth below, each of the factors necessary to approve settlements in this Circuit are present in this case and, as a result, the settlement should also be found to be in the best interests of the estate and approved by the Court.

29. . In this case, the Debtor began pursuing and examining information regarding the potential claims by and against IDB before the bankruptcy case was filed and throughout the bankruptcy case. After a thorough examination and analysis of the value of the claims by and against IDB, engaging in extensive litigation and contested matters in this bankruptcy case, both the Debtor and IDB employing financial consultants to thoroughly analyze each of the respective parties claims and the Debtors ability to operate and continue operating into the future, participating in extensive negotiations, correspondence, reviewing and analyzing documents supplied by each Party, and ultimately many iterations of the settlement agreement which involved non-debtor parties as well, the Debtor elected to enter into the proposed settlement

based upon (1) the amount of time to resolve the litigation and the costs to defend and continue with the litigation and contested matters, (2) the potential risks of the litigation and contested matters concerning the estate's property interest, and the net benefit available to the estate, (3) the collectability of the settlement, and (4) the settlement would put the Debtor in a better position for a distribution on allowed claims and provide funds to utilize in its reorganization efforts, and reduce its obligations to IDB dramatically.

30. In this case, even if the Court rejected the settlement and forced the Debtor to continue with the litigation and contested matters against the IDB, the result would in all likelihood be no more beneficial to the Estate than the terms set forth in the Agreement. In fact, the result could be more deleterious because the Debtor believes that the terms of the Agreement reflect the best-case resolution of the Estate's interests. Moreover, the Debtor is convinced that the costs of litigation and potential outcome, and continuing costs of administration, if such a course were pursued, would simply diminish any return to the Estate and place it in serious risk of obtaining a far less favorable outcome.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of September, 2026, at Los Angeles, California.

Robby Soofer